IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAMUEL L. BYRD, JR.,                          )
                                              )
            Plaintiff,                        )
                                              )   Case No. 07-0332(RMC)
      v.                                      )
                                              )   Judge Rosemary M. Collyer
U.S PAROLE COMMISSION, et al.,                )
                                              )
            Defendants.                       )

**RECEIVED**

JUN  1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## REQUEST FOR LEAVE TO FILE AMENDED COMPLAINT PURSUANT TO Fed.R.Civ.P. 15(a)

Samuel L. Byrd, Jr., the Plaintiff in the above captioned case respectfully requests leave

to file an Amended Complaint pursuant to Fed.R.Civ.P. 15(a). In support thereof Plaintiff states

as follows:

Fed.R.Civ.P. 15 (a) provides, "AMENDMENTS. A party may amend the party's pleading

once as a matter of course at any time before a responsive pleading is served or, if the pleading is

one to which no responsive pleading is permitted and the action has not been placed upon the

trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a

party may amend the party's pleading only by leave of court or by written consent of the adverse

party; and leave shall be freely given when justice so requires. A party shall plead in response to

an amended pleading within the time remaining for response to the original pleading or within 10

days after service of the amended pleading, whichever period may be the longer, unless the court

otherwise orders."

The Defendants' in this action have not served a responsive pleading at the date of this

request.

WHEREFORE, Plaintiff respectfully requests that his Amended Complaint is accepted.

Dated this _24th_ day of _May_ , 2007.

Respectfully submitted,

Samuel L. Byrd, Jr., pro se
Reg. No. 02016-016
U.S. Penitentiary Big Sandy
P.O. Box 2068
Inez, KY 41224

## CERTIFICATE OF SERVICE

I, Samuel L. Byrd, Jr. hereby attest that on the below listed date I deposited one true copy of my **"REQUST FOR LEAVE TO FILE AMENDED COMPLAINT PURSUANT TO Fed.R.Civ.P. 15(a)"** in the institutional mailbox, postage pre-paid first class, addressed to Quan K. Loung, Special Assistant United States Attorney, United States Department of Justice, U.S. Attorney's Office, 555 Fourth Street, N.W., Washington, D.C. 20001.

Dated this _24th_ day of _May_____, 2007.

_Samuel J. Byrd, Jr._
Samuel L. Byrd, Jr.

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMUEL L. BYRD, )<br><br>Plaintiff, )<br><br>v. )<br><br>U.S. PAROLE COMMISSION,<br>5550 Friendship Blud, Suite 420<br>Chevy Chase, M.D. 20815-7286, )<br><br>EDWARD F. REILLY, JR. Chairman<br>of the U.S. Parole Commission, )<br><br>CRANSTON MITCHELL, Commissioner<br>of the U.S. Parole Commission, )<br><br>PATRICIA K. CUSHWA, Commissioner<br>of the U.S. Parole Commission, )<br><br>DEBORAH A. SPAGNOLI, Commissioner )<br>of the U.S. Parole Commission, )<br><br>ISAAC FULWOOD, JR., Commissioner<br>of the U.S. Parole Commission, )<br><br>OTIS THOMAS, Examiner<br>of the U.S. Parole Commission, )<br><br>P. DENTON, Member<br>of the U.S. Parole Commission, )<br><br>JOHN DOE #1, Member<br>of the U.S. Parole Commission, )<br><br>JOHN DOE #2, Member<br>of the U.S. Parole Commission, )<br><br>TARNISHA JACKSON, Technician<br>of the U.S. Parole Commission, )<br><br>ANISSA N. HUNTER, F.O.I.A Specialist<br>of the U.S. Parole Commission, )<br><br>Defendants. ) | Case No.: 07-0332 (RMC)<br><br>Judge Rosemary M. Collyer |

## AMENDED COMPLAINT

Comes now, Samuel L. Byrd, Jr. ("Plaintiff"), a pro se litigant, and respectfully moves this Honorable court, pursuant to Fed.R.Civ.P. 15(a). This is a civil action brought by the above named Plaintiff who was convicted of violating various District of Columbia Codes ("D.C. Code") and who is presently confined at the United States Penitentiary Big Sandy, P.O. Box 2068, Inez, KY 41224. Defendants' are the Chairman and/or Commissioners', Examiners', F.O.I.A. Specialist, Technician and Members' of the United States Parole Commission ("Commission")and, as such, they, their predecessors, or their designees are and were responsible for considering and acting upon Plaintiff's request for parole. Plaintiff has been and continues to be subjected to various injurious acts by the Defendants', who have improperly denied Plaintiff's request for parole. Plaintiff seeks declaratory and injunctive relief.

### JURISDICTION

1. Plaintiff seeks to vindicate rights protected by the Ex Post Facto Clause of Article I, Section 9 of the United States Constitution, the Fifth and Fourteenth Amendments to the United States Constitution and Federal Law. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), (a)(4), and 42 U.S.C. § 1983.

2. This Court has the authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

3. This Court has jurisdiction to declare the rights of the Plaintiff and to grant all further relief found necessary and proper.

### VENUE

4. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).

2

5. Defendant Edward F. Reilly, Jr. is the current Chairman of the Commission.

6. Defendant Cranston J. Mitchell is a current Commissioner of the Commission.

7. Defendant Patricia K. Cushwa is a current Commissioner of the Commission.

8. Defendant Isaac Fulwood, Jr. is a current Commissioner of the Commission.

9. Defendant Deborah Spagnoli is a current Commissioner of the Commission.

10. Otis Thomas is a current Examiner of the Commission.

11. P. Denton is a current Member of the Commission.

12. John Doe #1 is a current Member of the Commission.

13. John Doe #2 is a current Member of the Commission.

14. Tarnisha Jackson is a current Technician of the Commission.

15. Anissa N. Hunter is a current F.O.I.A. Specialist of the Commission.

16. Defendants', as the Chairman and/or Commissioners', Examiners', F.O.I.A. Specialist, Technician and Members' of the Commission, were and are responsible for reviewing and acting upon Plaintiff's request for parole in accordance with the United States Constitution and federal law and regulations.

## **INTRODUCTION**

17. Plaintiff was convicted and sentenced by Judge Fred B. Ugast of the Superior Court for the District of Columbia for violations of various District of Columbia Codes. During the time Plaintiff committed these crimes, authority for parole decisions for D.C. Code violators was vested in the District of Columbia Parole Board ("Parole Board").

18. Congress enacted the National Capital Revitalization and Self-Government Improvement Act ("Revitalization Act"), Pub. L. No. 105-33, § 11231, 111 Stat. 712 (1997) on

or about August 5, 1997.

19. The Revitalization Act abolished the Parole Board, see Pub. L. 105-33 § 11231(b), and directed the Defendants', as the Chairman and Commissioners of the Commission, to conduct parole hearings for D.C. Code prisoners "pursuant to the parole laws and regulations of the District of Columbia", *id.* at 11231(c).

20. On August 5, 1998, Defendants' assumed the responsibility for making parole-release decisions for all eligible D.C. Code felons, pursuant to the Revitalization Act.

21. In 2000, despite the requirements of the Revitalization Act that the Defendants' apply the parole statutes, regulations, guidelines and practices of the Parole Board, the Defendants' published new parole rules, regulations, and guidelines that they deemed applicable to any D.C. Code inmate receiving an initial parole hearing after August 5, 2008 (the "2000 Guidelines"). *See* C.F.R. § 2.80(a)(5).

22. For inmate who had an initial parole hearing date prior to August 5, 1998, the Defendants' chose to apply the Parole Board's guidelines. *See id.* § 2.80(a)(1) & (5).

## I.    REGULATORY FRAMEWORK FOR PAROLE DECISIONS FOR D.C. CODE INMATES AT THE TIME OF PLAINTIFF'S CONVICTIONS AND SENTENCING.

23. Prior to 1980, at the time that Plaintiff committed the crimes for which he is currently imprisoned and at the time he was sentenced, the Parole Board administered parole proceedings for D.C. violators in the custody of the District of Columbia.

24. Prior to 1980, where D.C. Code offenders were in the custody of the United States Government, the Commission administered their parole hearings, but in such circumstances, the Commission was required to apply the parole Board's regulations, guidelines, policies and

4

practices, which were found by this Court to have the force and effect of law.

25.  Under the Parole Board's statutes, regulations, guidelines, policies, and practices, the "minimum sentence" for a crime, i.e., the period that an inmate must serve before he or she is eligible for parole, satisfied the inmate's accountability for the offense of conviction.

26.  In conducting parole hearings and making parole determinations, the Parole Board applied mandatory guidelines, many of which were codified as municipal regulations, that carefully prescribed the method and criteria that the Parole Board used to render decisions on parole requests. As its guide for determining whether an incarcerated individual would be paroled or re-paroled, the Parole Board used the criteria set forth in the guidelines.

27.  At the time the Plaintiff committed the crimes for which he is currently imprisoned, and at the time of his sentencing for those crimes, the Parole Board made parole decisions for D.C. Code offenders using guidelines that it formally adopted in 1985, and published in the District of Columbia Municipal Regulations in 1987 (the "1987 Guidelines").

28.  In 1991, to ensure consistent and equitable application of the 1987 guidelines and other parole regulations, the Parole Board adopted a Policy Guideline defining terms used in the 1987 Guidelines (the "1991 Policy Guideline"). The 1991 Policy Guideline applied to all requests for parole heard by the Parole Board.

29.  The 1987 Guidelines required the Parole Board to calculate a Salient Factor Score ("SFS") for each prisoner. Based on a parole applicant's SFS, the Parole Board then calculated a "total point score", using pre- and post-incarceration factors, on which it based its decision to either grant or deny parole. In "unusual circumstances", when mitigating and/or countervailing factors applied, the Parole Board could depart from an action (to grant or to deny parole)

5

otherwise indicated by an inmate's total point score.

30. In the case of an initial parole hearing, the 1987 Guidelines state that:

> After determining an adult parole candidate's SFS score and
> after applying the pre and post incarceration factors to arrive at
> a total point score pursuant to § 204 and Appendix 2-1, the
> Board shall take one (1) of the following actions:
>
> > (a) IF POINTS = 0: Parole shall be granted at initial hearing
> > with low level of supervision required;
> >
> > (b) IF POINTS = 1: Parole shall be granted at initial hearing
> > with high level of supervision required;
> >
> > (c) IF POINTS = 2: Parole shall be granted at initial hearing
> > with highest level of supervision
> > required; or
> >
> > (d) IF POINTS=3-5:Parole shall be denied at initial hearing
> > and rehearing scheduled.

31. In the case of a parole rehearing, the 1987 Guidelines state that:

> In determining whether to release on parole an adult or a youth offender
> appearing before the Board at a parole rehearing, *the Board shall take the
> total point score from the initial hearing* and adjust that score according to
> the institutional record of the candidate since the last hearing pursuant to
> Appendix 2-2. The Board shall then take one of the following actions:
>
> > (a) IF POINTS = 0-3: Parole shall be granted at this rehearing
> > highest level o[f] supervision
> > required; or
> >
> > (b) IF POINTS = 4-5: Parole shall be denied and a rehearing
> > date scheduled.

32. The 1987 Guidelines directed the Parole Board to grant parole to an adult at a parole

rehearing if the final adjusted score is less than four, except in "unusual circumstances," as

discussed *infra* paragraphs 40-42.

33. The manner in which the "institutional record of the candidate" is used to adjust the

6

total point score from the initial hearing, as required by 28 D.C.M.R. § 204.221, also is the

subject of precise guidelines adopted by the Parole Board.  The adjustment is done via the "point

grid" in Appendices 2-1 and 2-2 of title 28 of the District of Columbia Municipal Regulations.

Appendix 2-1 is used to calculate an inmate's SFS and total point score at the initial hearing, and

Appendix 2-2 is used to calculate an inmate's SFS and total point score at a parole rehearing.

34.  Pursuant to Appendices 2-1 and 2-2 of the Parole Board Guidelines, in parole

hearings, one point can be added to an inmate's total point score for "negative institutional

behavior."

35.  In section VI.A.1 of the 1991 Policy Guidelines, the Parole Board defined the types

of institutional disciplinary actions that would qualify as "negative institutional behavior";

> **1.     Negative Institutional Behavior** consists of serious or repeated major
> disciplinary infractions as described below that are sanctioned under Department
> of Corrections due process procedures.
>
> > (a).     In INITIAL PAROLE CONSIDERATION cases, the following
> > disciplinary infractions shall ordinarily be considered as negative institutional
> > behavior:
> >
> > > (1)  One Class I Offense for murder, manslaughter, kidnapping,
> > > armed robbery or first degree burglary at any time during the
> > > minimum sentence (See DCMR 28-502.3, May 1987); <u>OR</u>
> > >
> > > (2)  One Class I Offense...*during the 12 months preceding
> > > the hearing OR during the last half of the minimum sentence
> > > up to a period of three years,* whichever is longer; <u>OR</u>
> > >
> > > (3)  Two Class II Offenses...*during the 12 months preceding
> > > the hearing OR during the last half of the minimum sentence
> > > up to a period of three years,* whichever is longer.
> >
> > (b)     In PAROLE RECONSIDERATION cases, the following
> > disciplinary infractions occurring *since the preceding release
> > consideration on the sentence* shall ordinarily be considered as
> > negative institutional behavior:

(1) One Class I Offense (see DCMR 28-502.2 through 502.17, May 1987); OR

(2) Two Class II Offenses (see DCMR 28 503.2 through 503.12, May 1987).

36. Pursuant to Appendices 2-1 and 2-2, in parole hearings, one point can be subtracted from an inmate's total point score for "Program Achievement" )referred to in the 1991 Policy Guideline as "sustained program or work assignment achievement").

37. Section VI(A)(2)(a) of the 1991 Policy Guideline defines "sustained program or work assignment achievement" for purposes of Appendix 2-1 as:

> In INITIAL PAROLE CONSIDERATION cases, the following accomplishments shall ordinarily be considered as sustained program or work assignment achievement during the period of incarceration:
>
>> (1) Successful completion of one or two educational or vocational programs, or program levels, each of which enabled the offender to develop an academic or job-related skill, OR enabled the offender to progress to a higher level of difficulty or skill in the program area.

38. For purposes of parole rehearings under Appendix 2-2 of the 1987 Guidelines, Section VI(A)(2)(b) of the 1991 Policy Guideline defines "sustained program or work assignment achievement": "In PAROLE RECONSIDERATION cases, the accomplishments set forth in Section VI-A-2(a) of this policy shall ordinarily be considered as sustained program or work assignment achievement where completion occurred since the proceeding consideration for release on the sentence."

39. The "negative institutional behavior" and "program achievement" factors correspond to two findings required by Appendices 2-1 and 2-2: "Has this offender committed serious infractions (adjudicated under Department of Corrections due process procedures)?" and "Has

8

this offender demonstrated sustained achievement in the area of prison programs, industries or work assignments during this period of incarceration?"

40. As noted above, the Parole Board could depart from the result dictated by sections 204.19 and 204.21 only in "unusual circumstances", and when it followed particular procedures: Any parole release decision falling outside the numerically determined guidelines should be explained by reference to the specific aggravating or mitigating factors as stated in Appendices 2-1 and 2-2. Section 2-4.22 of the District of Columbia Municipal Regulations provides that:

> The Board may, *in unusual circumstances*, waive the SFS and the pre and post incarceration factors [which comprise the total point score] set forth in this chapter to grant or deny parole to a parole candidate. In that case, the Board shall specify in writing those factors which it used to depart from the strict application of the provisions of this chapter.

41. In the 1991 Policy Guideline, the Parole Board further defined the scope of its authority to deny parole for "unusual circumstances" which a point score indicates that parole should be granted. Section VI(C) of the 1991 Policy Guidelines, titled "FACTORS COUNTERVAILING A RECOMMENDATION TO GRANT PAROLE," lists and defines the following to constitute "unusual circumstances" countervailing a grant of parole:

> a. Repeated Failure Under Parole Supervision;
>
> b. Ongoing Criminal Behavior;
>
> c. Lengthy History of Criminally-Related Alcohol Abuse;
>
> d. History of Repetitive Sophisticated Criminal Behavior;
>
> e. Unusually Extensive or Serious Prior Record;
>
> f. Instant Offense Involved Unusual Cruelty to Victim, which applied where the offense involved physical, mental, or emotional abuse beyond the degree needed to sustain a

9

> conviction on the instant offense or especially vulnerable
> victims such as children or elderly persons; and

> g. Repeated or Extremely Serious Negative Institutional Behavior.

42. The Parole Board further defined these "unusual circumstances" in the 1991 Policy Guideline and established objective criteria to determine their applicability.

## II.    THE PAROLE REGULATIONS USED BY THE DEFENDANTS'.

43. As note above, the Revitalization Act abolished the Parole Board and directed the Commission to conduct parole hearings for District of Columbia offenders according to the parole statutes, regulations, guidelines, policies, and practices of the District of Columbia.

44. After the commission assumed responsibility for parole hearings for D.C. Code offenders, the Commission adopted the 2000 Guidelines and determined that those guidelines would apply to any D.C. Code offender that had not received an initial parole hearing as of August 5, 1998.

45. Unlike the Parole Board's statutes, regulations, guidelines, policies, and practices, the Commission 2000 guidelines and parole eligibility criteria do not consider the completion of a prisoner's "minimum sentence" as satisfying offense accountability.  Instead, the commission and its designees have repeatedly denied D.C. inmates' requests for parole, including Plaintiff's, on the ground that they believe that the inmates have not served enough time for their offenses, i.e., that the inmates have not been incarcerated long enough to satisfy the accountability of their offense.

### A.    PAROLE ELIGIBILITY

46. To account for the nature and circumstances of parole applicants' offenses, and the

10

history and characteristics of the prisoners, the 2000 guidelines contain instructions for the rating

of certain offenses. Chapters 1 through 12, § 2.20 of the Commission Rules and Procedures

comprise the Commission's offense severity index.

47. Like the 1987 Guidelines, the 2000 Guidelines require the Commission to determine

a Salient Factor Score ("SFS" ) for each parole applicant, which is based upon factors such as

prior convictions/adjudications; prior commitments of more than 30 days; age at current

offense/prior commitments; recent commitment-free period probation/parole/confinement/escape

status at the time of the current offense; and, the age of the offender. The Commission's

guidelines, however, also allow the "Commission [to] take into account any substantial

information available to it in establishing the prisoner's offense severity rating, salient factor

score, and any aggravating or mitigating circumstances, provided the prisoner is appraised of the

information and afforded an opportunity to respond." Under the Commission guidelines, the SFS

becomes a part of a Base Point Score ("BPS") which is comprised of three categories in which

points are assigned according to the following factors:

> Category I   - Risk of Recidivism (Based on the Salient Factor Score)
> Category II  - Current or Prior Violence
> Category III - Death of a Victim or High Level of Violence

(Although the Parole Board guidelines also require the information of an SFS for parole

applicants, the Parole Board used the SFS only to determine the risk of recidivism on the part of

the parole applicant. The Parole Board did not use the SFS as the basis for an increased in the

period of imprisonment the inmate had to serve to demonstrate parole suitability.)

48. The Commission's method of determining parole eligibility is to apply the BPS (the

combination of points assigned from Categories I - III) to the appropriate category of offense

11

behavior, then to *add the* corresponding number of *months to a parole applicant's minimum sentence* (the number of months an inmate must serve before becoming eligible for parole), based on the offense severity index. The months added to the parole applicant's minimum sentence based on the BPS are considered to be the "Base Guideline Range", and are used by the Commission and its designees to determine the additional months of imprisonment that the inmate must serve above the months that the Parole Board required for parole eligibility.

### 1.    Program Achievement

49.    Pursuant to section 2.80(c)(1) of the Commission's guidelines, the Commission "shall assess whether the prisoner has demonstrated ordinary or superior achievement in the area of prison programs, industries, or work assignments while under confinement for the current offense." Under this structure, the Commission has the sole discretion of determining whether the parole applicant's work and program achievements are to be considered "superior" or "ordinary". Per the Commission's guidelines, "if superior achievement is found, the award for superior program achievement shall be one-third of the number of months during which the prisoner demonstrated superior program achievement." (The Parole Board guidelines, on the other hand, used an objective standard to reward "Sustained Program Achievement or Work Assignment Achievement", and an award is granted even for what the Commission might consider "ordinary" achievement.)

### 2.    Institutional Behavior

50.    The Commission's guidelines, like those of the Parole Board, take an inmate's institutional behavior into account for purposes of parole determinations. Unlike the Parole Board's guidelines, the 2000 Guidelines determine a range of months that the Commission adds

12

to an inmate's minimum sentence under the provisions of 28 C.F.R. § 2.36 "for any significant disciplinary infractions since the beginning of confinement on the current offense in the case of an initial hearing, and since the last hearing in the case of a rehearing." 28 C.F.R. § 2.80(j).

51. Unlike the Parole Board's guidelines, 28 C.F.R. §§ 2.80(j) and 2.36 do not limit consideration at initial parole hearings of institutional behavior within the three years prior to the parole hearing.

## B.    DETERMINING WHETHER TO GRANT PAROLE

52. The "Total Guideline Range" (the ultimate determination of time to be served to established presumptive suitability for parole pursuant to the Commission's guideline structure) is reached by adding: "the minimum of the base point guideline range, the number of months required by the prisoner's parole eligibility date, and the minimum of the guideline range for disciplinary infractions, in applicable. Then subtract the award for superior program achievement, if applicable."

53. After calculating an inmate's Total Guideline Range, under the 2000 Guidelines, the Commission "may, in unusual circumstances, grant or deny parole to a prisoner notwithstanding the guidelines." 28 C.F.R. § 2.80(n).

54. 28 C.F.R. § 2.80(n) defines "unusual circumstances" for purposes of the 2000 Guidelines and provides examples similar to those applied by the Parole Board, but without the definitions of such unusual circumstances that the Parole Board adopted in the 1991 Policy Guideline to ensure consistency in parole determinations.

55. Pursuant to section 2.80(a)(4) of the Commission's guidelines regarding D.C. Code offenders, the Commission's guidelines apply to "all prisoners who are given initial parole

13

hearings on or after August 5, 1998. For prisoners whose initial hearings were held prior to August 5, 1998, the Commission shall render its decisions by reference to the guidelines applied by the D.C. Board of Parole." Thus, regardless of the statutes, regulations, guidelines, policies and practices in effect when an offender committed his or her crime and was sentenced, the offender's fitness for parole may hinge arbitrarily upon the date of his or her initial parole hearing.

### III.    PLAINTIFF SAMUEL BYRD'S PAROLE HEARING

#### A.    Defendants' Use of the Guidelines

56.  On May 14, 1981, D.C. Superior Court Judge Fred B Ugast sentenced Plaintiff to 32 years to life for : First Degree Murder in violation of D.C. Code 22-2401, 3202; Premeditated Murder in violation of D.C. Code § 22-2401; Felony Murder in violation of D.C. Code § 22-2401; Kidnapping  While Armed in violation of D.C. Code § 22-2101, 3202 (1973); Armed Robbery in violation of D.C. Code § 22-2901; Four counts of Assault With A Dangerous Weapon in violation of D.C. Code § 22-502; Grand Larceny in violation of D.C. Code § 22-2201; Unauthorized Use Of A Motor Vehicle in violation of D.C. Code § 22-2204; and Carrying A Pistol Without A License in violation of D.C. Code § 22-3204.  At sentencing, the mandatory sentences (20 years) were run consecutively away from the non-mandatory sentence (12 years) totally 32 years.

57.  Under the statutes, regulations, guidelines, policies, and practices of the Parole Board, Plaintiff became eligible for parole on September 6, 2006.

58.  Defendants' or their predecessors assigned an examiner, Mr. Otis Thomas to conduct Plaintiff's initial hearing.

59.  Although Plaintiff had been convicted and sentenced at a time when the Parole Board

14

applied guidelines prior to the 1987 guidelines and other policies and practices to parole

determination, the Plaintiff questioned the use of the 2000 guidelines. Defendants' or their

predecessors instructed the Hearing Examiner to use their 2000 Guidelines in evaluating

Plaintiff's request for parole release.

60. Under the Parole Board's statutes, regulations, guidelines, policies and practices,

Plaintiff had served the "minimum sentence" for his offense when he became eligible for parole.

Under the Parole Board's statutes, regulations, guidelines, policies and practices, the "minimum

sentence" represented the period that an inmate needed to serve to satisfy the inmate's

accountability for the offense itself.

61. Upon a lengthily exchange between the examiner (Defendant Thomas) and Plaintiff,

Plaintiff inquired why he was not having an "In House" parole hearing with a live person; was

Mr. Thomas who he claimed to be?; Why could not Plaintiff see him on the video? (the black

box was not what Plaintiff expected after 27 years of incarceration); and, Why did it take an extra

30 (approx.) months for Plaintiff to receive his parole hearing than what was specified?  Mr.

Thomas stated, "If you were a California prisoner you would not be before this Board with the

three strikes." Conversely, Plaintiff would not have had three strikes law applied to him for

offenses that occurred before such law became effective as occurred to him by the Commission

retroactively applying new guidelines post hoc.

62. Upon Plaintiff's request via the Freedom of Information Act for a copy of the taped

proceedings so that he could show the arbitrary and capricious hearing he received, Defendants'

claimed that the tape recording of the hearing was blank, thereby preventing him from showing

Mr. Thomas' lack of impartiality and un professionalism in conducting Plaintiff's hearing.

15

63. The D.C. Parole Board guidelines required that Plaintiff serve the mandatory 20 years (of the 20 year to life sentence) plus one-third of the 12 year non-mandatory sentence (i.e. 48 months), for a combined total of 288 months before he became eligible for parole.

64. Under the newly enacted federal parole board policies and regulations, Plaintiff has a Base Point guideline score of 9, which falls into the range of 110-140. The 110-140 months was then added to the parole eligibility date (in this case 326 months), thus requiring him to serve 442-486 months before he becomes eligible for parole (which is "more time" than the court imposed).

65. At Plaintiff's initial parole hearing, Defendant Thomas failed to award Plaintiff for all of his Superior Programming achievements while knowingly acknowledging that Plaintiff had over 693 educational hours completed; numerous awards; and, had just finished a two year residential treatment program (i.e. The Code Program). Although policy and regulations of the Defendants' clearly supported that Plaintiff should have been granted at least 8 years or more for Superior Programming, he was only awarded six months by Defendant Thomas.

66. Defendants' use of inaccurate information and charges poisoned the parole hearing. Examiner Thomas admitted Plaintiff was in custody on an alleged assault. Citing prison misconduct on three disciplinary reports, he noted correctly that the last one was over 15 years old. However, Defendant Thomas stated that Plaintiff had not satisfied the accountability required by the parole board and was recommending a five year reconsideration date.

67. In late September 2006, Plaintiff received his Notice of Action denying parole and a reconsideration five year date for September, 2011. The Notice of Action indicated that their decision was not appealable.

68. Plaintiff requested to know from Defendant Reilly what the decision to deny parole was predicated upon since the tape recording of the parole hearing was blank. Defendant Reilly stated, "You were provided with 171 pages of documents including the written summary of your hearing and relevant worksheets. Therefore, you were provided with the documentary evidence and the reason for the decision in your case."

### B. PLAINTIFF'S RIGHTS UNDER THE PAROLE BOARD'S 1987 PAROLE GUIDELINES.

69. Had the Commission evaluated Plaintiff under the D.C. Parole Guidelines, his SFS at his initial hearing would have been 9 and "total point score" would have been 0, which would have included a negative 1 (-1) for his Superior Programming Achievement.

70. Under the Parole Board's 1987 Guidelines, if the grid point score equals three or less, parole should be granted unless the Parole Board finds that "unusual circumstances" are present. 28 C.F.R. §§ 204.19, 204.22.

71. No unusual circumstances, as defined by the Parole Board applies to Plaintiff's hearing.

72. Under the Parole Board's statutes, regulations, guidelines and practices, Plaintiff would have satisfied accountability for his offense after serving 288 months.

73. Defendants' application of the 2000 Guidelines rather than the 1987 (or guidelines enacted prior to 1987) and the denial of parole on the ground that Plaintiff has not served sufficient time to be accountable for his crime, has resulted in significant risk of prolonging Plaintiff's incarceration beyond what he otherwise would have served thereby violating the Ex Post Facto Clause of the United States Constitution.

17

## COUNT I

## THE DEFENDANTS' VIOLATED THE EX POST FACTO CLAUSE OF THE UNITED STATES CONSTITUTION

74. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 73 as if fully set forth herein.

75. The retroactive application of a new law, resulting in a significant risk of prolonging an inmate's sentence beyond what would have resulted under the guidelines in effect when the inmate was convicted, constitutes a violation of the Ex Post Facto clause of the United States Constitution.

76. Prisoners are entitled to know the range of punishment available at the time of sentencing, and during the adjudication of their cases. The Ex Post Facto Clause assures that individuals are given fair warning of what actions will be punished *and the degree to which they will be punished.*

77. Under the 2000 Guidelines and their own interpretation of the parole Board's 1987 Guidelines and 1991 Guideline, the Defendants', their predecessors, and/or their designees have denied the Plaintiff's request for parole and significantly increased the risk that Plaintiff's period of incarceration will be prolonged and that he will serve longer than he would have had the Parole Board's guidelines, policies, and practices been applied. Specifically, Defendants' have significantly increased the risk that Plaintiff will serve a longer period of incarceration than they would have had the Parole Board's statutes, regulations, guidelines, policies, and practices been applied correctly by:

        a. increasing the period the Parole Board considered as satisfying offense

18

accountability, i.e. Plaintiff's parole eligibility date;

b. failing to give Plaintiff credits he earned for program achievements pursuant to the Parole Board's Guidelines; and,

c. increasing Plaintiff's guideline ranges by considering disciplinary infractions that the Parole Board would have ignored.

78. By ignoring the Parole Board's statutes, regulations, guidelines, policies, and practices, which consider the Plaintiff's minimum sentence as satisfying offense accountability, the Defendants' have necessarily significantly increased the risk that the Plaintiff will be incarcerated longer than they would have been had the Parole Board's statutes, regulations, guidelines, policies, and practices been applied.

79. Similarly, Defendants' have necessarily significantly increased the risk that Plaintiff will be incarcerated longer by failing to award Plaintiff credit for program achievements if Defendants' felt that such achievements did not rise to the level of "superior program achievement," as opposed to the Parole Board's standard of "sustained program achievement."

80. Finally, it cannot be disputed that Defendants' have necessarily significantly increased the risk that Plaintiff will be incarcerated longer than he would have been had the Parole Board's Guidelines been applied by considering institutional infractions that would not have affected the Parole Board's consideration of Plaintiff's parole application in any way.

## COUNT II

### VIOLATION OF THE PLAINTIFF'S FIFTH AMENDMENT AND FOURTEENTH AMENDMENT DUE PROCESS RIGHTS

81. Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 73 as if fully set forth herein.

19

82. Plaintiff has constitutionally protected interests in receiving credit for his program and work achievements as provided for under the 1987 Guidelines, the 1991 Policy Guideline, and the Commission's own 2000 Guidelines. In previously-outlined instances, however, Defendants' have refused to give Plaintiff credit for such achievement earned prior to his parole hearing.

83. Further, the Defendants' continue to apply improper self-imposed standards, rather than the guidelines established by the Parole Board, which held authority over the Plaintiff who was a D.C. Code offender at the time of his conviction and sentencing.

84. Defendants' have failed to apply the very guidelines they officially state they are applying. Defendants' violated Plaintiff's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution when they failed to follow the very guidelines they are purporting to apply.

85. Defendants' Parole Hearing was arbitrary and capriciously administered to Plaintiff and in violation of his due process rights under the Fifth and Fourteenth Amendments of the United States Constitution.

86. Plaintiff has due process interests in receiving a parole hearing by an individual who does not lack impartiality.

87. Defendants' violated Plaintiff's rights to due process by providing a prejudicial hearing officer and then engaged in spoliation of evidence to prevent the facts from being known, in violation of Plaintiff's rights under the Fifth and Fourteenth Amendments of the United States Constitution.

88. As a result, Defendants' have denied Plaintiff his constitutional right to a fair review

20

process.

## **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court:

1. require that Defendants' apply the Parole Board's statutes, regulations, guidelines, policies, and practices, including, but not limited to the 1987 Guidelines and the 1991 Policy Guidelines, to Plaintiff's request for parole;

2. deem that Plaintiff's service of his sentence to his parole eligibility date satisfy the offense accountability for parole consideration purposes;

3. order the Defendants' to reconsider the decisions rendered on Plaintiff's application for parole based on the existing record in a manner consistent with the D.C. Parole Board's 1987 Guidelines, 1991 Guideline, the other statutes, regulations, guidelines, policies, and practices of the Parole Board, federal regulations, the Constitution, and all other requirements of law;

4. award Plaintiff all litigation expenses and attorney fees that become relevant to this case;

5. grant such other and further relief as the Court deems appropriate.

Dated: _May 24_, 2007.

Respectfully submitted,

Samuel L. Byrd, Jr. pro SE
Reg. No. 02016-016
United States Penitentiary Big Sandy
P.O. Box 2068
Inez, KY 41224

21

## CERTIFICATE OF SERVICE

I, Samuel L. Byrd, Jr. hereby attest that on the below listed date I deposited one true copy of my **"AMENDED COMPLAINT"** in the institutional mailbox, postage pre-paid first class, addressed to Quan K. Loung, Special Assistant United States Attorney, United States Department of Justice, U.S. Attorney's Office, 555 Fourth Street, N.W., Washington, D.C. 20001.

Dated this _24th_ day of _May_____, 2007.

_Samuel L. Byrd, Jr._
Samuel L. Byrd, Jr.